**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | | |
|---|---|---|
| **DENNIS KELLY SMITH, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **3:03-cv-365** |
| | ) | |
| **EDDIE SHOFFNER, *et al.*,** | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, Dennis Kelly Smith (Mr. Smith), his wife, Christy Dawn (Mrs. Smith), and their minor child, Jordan (Jordan), have sued the defendants, Eddie Shoffner (Shoffner), Nancy Hager (Hager), Steve Cline (Cline), Stephen Hurley (Hurley), Michael Gray (Gray), Tony Clark (Clark) and Claiborne County, Tennessee, alleging violations of federal constitutional law and state law arising out of the procurement and execution of a search warrant upon the plaintiffs' residence on July 14, 2002.[1]  Defendants have moved the court to enter summary judgment in their favor [ECF# 19].  Plaintiffs have responded [ECF# 50], to which defendants have replied [ECF# 54].  For the following reasons, the court **GRANTS** the defendants' motion.

---

[1]Cline and Hurley are members of the Claiborne County Sheriff's Department. Shoffner is the former Sheriff.  Hager is a former Deputy Sheriff.  Clark and Gray are former members of the Sheriff's Department.

## BACKGROUND

During the time period at issue, Shoffner and Hager used a particular confidential informant (CI) to obtain evidence for drug arrests in Claiborne County. The CI had been providing information on a regular basis since 1998. It appears that on more than twenty occasions prior to this incident, the CI had provided reliable information to both Shoffner and Hager.

According to Shoffner, the CI came to see him on the morning of July 13, 2002. Even though Shoffner had assigned the CI to Hager, he still sought out Shoffner, purportedly because the Sheriff paid more. The CI informed Shoffner that some marijuana was coming in that night and that some meth might also be present. The former Sheriff told the informant that the CI needed to personally view the marijuana and confirm whether any meth was on the premises. When the CI came back the next morning, he showed Shoffner some marijuana he claimed to have purchased at the targeted residence. Because of his required attendance at a meeting. Shoffner told the CI to go see Hager. Shoffner apparently wanted Hager to check out the information and to get back to him on it. Later that day, between 4:00 and 4:30 p.m., Hager was contacted by the CI, who reported that he had been to the trailer of Greg Brown and obtained marijuana. He indicated that the occupants of the residence told him there was 116 pounds of marijuana in the closet of the master bedroom. The CI also informed Hager that two individuals known to be "meth-cookers" were at the residence with methamphetamine (meth) on them. The CI gave Hager directions to the trailer, from which Hager determined the mobile home to be located at 139 Blake Lane in

2

Tazewell, Tennessee. She contacted Shoffner and they decided to immediately seek a search warrant. Officers Jon Malone and Gray followed the directions provided by the CI to confirm the location of the mobile home, the description of the vehicles in the residence's driveway, and the specific distances for the search warrant application. Hager prepared the appropriate documentation and Shoffner signed it. At approximately 9:30 p.m., Chancellor Billy Joe White (Chancellor White) reviewed the information and issued the search warrant. After assembling at the Sheriff's Department, a team of officers then proceeded to the targeted residence.

The Smiths claim that at approximately 10:15 p.m., just as they were preparing to go to bed, the defendants burst through the doors of their home. Cline, Hurley and Gray initially entered the trailer through the back door, with Hurley wearing a mask to conceal his identity. Clark entered the home through the front door. Defendants do not dispute the Smiths' claims that both Mr. and Mrs. Smith were placed on the ground, with Mr. Smith also being handcuffed. One officer remained with Jordan, just inside the residence. According to defendants, the decision to place Mr. and Mrs. Smith on the ground and to handcuff Mr. Smith was consistent with their training. They contend that because the situation was perceived to be potentially dangerous, the placement of the adults in a non-threatening position ensured the safety of all involved.

After the residence had been cleared, Shoffner and Hager entered the home. Upon realizing the information given by the CI was incorrect, Shoffner instructed all the officers to leave and he and Hager remained behind to explain to the Smiths what had

3

happened.  Shoffner told the plaintiffs that an informant had given the police the wrong information and, based upon that information, the defendants had mistakenly raided the Smiths' home.

According to plaintiffs, Shoffner had known the CI's family for a long time, as the CI's uncle worked for Shoffner's father.  Additionally, the CI's uncle and father had encouraged Shoffner to run for Sheriff.  Shoffner considered the CI to be "like a member of the family," and thought of the CI's paternal uncle as "a brother."  After becoming Sheriff, Shoffner had looked into allegations by the CI's father that excessive force had been used against the CI.  While no disciplinary action was taken against any officer, Shoffner apparently "felt like other officers weren't as diplomatic with [the CI] as it took." The fact that the CI was an active drug abuser during the time he was providing information to the defendants was known to Shoffner, yet he considered the CI to be a "dream informant."

Plaintiffs note that Hager had paid the CI for information or for making controlled buys on seventeen occasions between August of 2001and May of 2002.  On each of those occasions, Hager had closely monitored him.  The last time she paid the CI for information was on May 22, 2002, two months before the raid on plaintiffs' home. Hager indicates she had contact with the CI two or three times between May 22, 2002 to July 14, 2002.

In regard to her July 14th conversation with the CI, Hager admits that she did not write down everything the CI told her. Shoffner states that he did not confirm the information in this case because it "was a Sunday. Everything was closed. They were moving fast for 100 pounds of marijuana so they didn't check anything through Emergency 911." Shoffner admits that he read and signed the affidavit even though he did not talk to the officers who measured the distance to the plaintiffs' home.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding upon a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *City Management Corp. v. United States Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of their case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986).

5

## 42 U.S.C. § 1983

There are two essential elements of a § 1983 claim: (1) "there must be a deprivation of the plaintiff's rights, privileges, or immunities secured by the Constitution and laws ... of the United States"; and (2) "the plaintiff must allege that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage,' of any State or Territory." *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982). To succeed, the plaintiff must show that: (1) a person (2) acting under color of state law (3) deprived him of rights secured by the United States Constitution or its laws. *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). However, by its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of established rights. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427 (1985). Here, there is no question that the defendants were acting under color of state law while engaged in the conduct at issue in this case.

## THE SEARCH WARRANT

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978), the Supreme Court held that a warrant may be invalidated based upon intentionally or recklessly misrepresented facts in a search warrant affidavit. *Id.* at 155. "A party may only challenge the veracity of an affidavit if that party can make a 'substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and that the allegedly false statement was necessary for a finding of probable cause. The inquiry does not continue

6

if the court finds that the exclusion of the allegedly false statement does not result in a lack of probable cause...." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (citing *Franks, id.*).

In *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998), the Sixth Circuit indicated that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays*, 134 F.3d at 816 (italics in original). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

"Probable cause" is established when "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988). Where qualified immunity is asserted and there is no material dispute of fact existing, the issue of probable cause is one for the court, since "the entitlement is immunity from suit rather than a mere defense to liability." *Hunter v. Bryant*, 502 U.S. 224, 227-28, 112 S.Ct. 534 (1991).

7

In this case, plaintiffs assert Shoffner failed to control the proper procurement and execution of the search warrant and, along with Hager, had a reckless disregard for the truthfulness of the statements contained in the warrant. Plaintiffs assert that Shoffner and Hager secured the search warrant by submitting an application containing misrepresentations and omissions to the issuing judge. Plaintiffs further argue the search warrant did not meet the particularity requirement of the Fourth Amendment, in that it did not contain particulars concerning both the place to be searched and the items to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284 (2004).

Plaintiffs also complain that Shoffner's policy of relying solely on the CI's information and permitting the CI's unsolicited information to substitute for proper police investigation resulted in the "avoidable" raid upon the Smith family. Plaintiffs argue the former Sheriff had an ample opportunity to run a license tag check on the cars in the Smiths' driveway; such a search would have informed the defendants that they had the wrong residence. Plaintiffs further assert that defendants should have checked with the Registrar of Deeds or the 911 Dispatch Center to learn who owned the targeted residence. Additionally, plaintiffs note that while approaching the mobile home, all the defendants should have noticed the name "Smith" on the plaintiffs' mailbox as opposed to "Brown."

While appearing before the Chancellor, plaintiffs argue that Shoffner was evasive about the CI. According to plaintiffs, the former Sheriff did not reveal the informant's name, did not tell that the CI had not been used in two months, and did not relate that

8

on all other occasions when Hager used the CI, he had been monitored either in person or by use of a wire surveillance, and the officers had conducted independent and corroborating investigations to confirm the information provided by the CI. In this matter, no further investigation was conducted to corroborate the statements of the CI. Additionally, plaintiffs assert that Shoffner did not tell Chancellor White that it had been much longer than three hours since the CI had been in the targeted residence and that the CI was an active drug abuser.

Furthermore, plaintiffs claim Shoffner's affidavit is invalid because it is based on information given to Hager, not Shoffner. Plaintiffs argue that Shoffner never disclosed to the issuing judge that he had not personally received all of the information from the source. According to plaintiffs, "if information concerning the alleged offense was obtained from someone other than the affiant, the affidavit must disclose that fact." *Whiteley v. Warden*, 401 U.S. 560, 568-69, 91 S.Ct. 1031, 1037 (1971). Plaintiffs additionally note that the CI did not mention seeing drug paraphernalia, but such claim was put in the affidavit without basis for that belief.

At issue here is the right guaranteed under the Fourth Amendment that warrants may be issued only upon a showing of probable cause. *Greene v. Reeves*, 80 F.3d 1101, 1105 (6th Cir. 1996). If an officer has knowingly made false statements or omissions of fact to a judge "such that but for these the judge would not have issued the warrant," probable cause is lacking. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). Such an officer, therefore, faces liability under 42 U.S.C. § 1983 if he or she

9

makes material false statements, knowingly or in reckless disregard for the truth, in order to establish probable cause for the warrant's issuance.  *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).

Plaintiffs must make a strong preliminary showing "that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause."  *Mays*, 134 F.3d at 816 (italics in original). Only if the plaintiffs make this "strong preliminary showing" may the court "consider the affidavit including the omitted portions and determine whether probable cause still exists."  *Atkin*, 107 F.3d at 1217.  Absent this first preliminary showing, the district court may not engage in the second inquiry related to probable cause.

The sufficiency of a search warrant affidavit is tested through an examination of the "totality of the circumstances."  *Illinois v. Gates*, 462 U.S. 213, 230-31, 103 S.Ct. 2317 (1983).  The court finds there is no evidence on the record that would establish Shoffner's intent to mislead the Chancellor.  The mere existence of omissions and inaccuracies alone is ordinarily not enough to make the strong preliminary showing. The court finds that the alleged false statements and omissions in this case were not material to the issuance of the warrant.  *Hale v. Kart*, 396 F.3d 721, 727 (6th Cir. 2005). Thus, even if all the "errors" described by plaintiffs had been made known to Chancellor White, probable cause still existed for the issuance of the warrant.  The affidavit disclosed the basis for Shoffner's belief that illegal drugs would be found at the location and the warrant listed the property to be seized as "marijuana, drug paraphernalia,

10

plastic packaging wrap, records of sales, financial records and weighing scales." The application described the probable existence of significant quantities of illegal drugs and clearly made a connection between the location to be searched and illegal activity. The information obtained from the CI was of the type and nature reasonably relied upon by law enforcement officers, particularly in view of the past dealings Shoffner and Hager had with the CI and the accuracy of prior information obtained from him. Prior to the application for the warrant, Shoffner and Hager obtained sufficient confirmation of the informant's information relating to the location of the trailer at issue. The necessary information was properly submitted to Chancellor White for an impartial review for the purpose of obtaining a search warrant. In the view of the court, the materials provided to the Chancellor presented ample evidence of probable cause that drugs would be found at the targeted residence. Upon a "totality of the circumstances" review, the affidavit and warrant contained sufficient indicia of probable cause to allow the officers and the Chancellor to reasonably rely on them. *Hale*, 396 F.3d at 726.


**QUALIFIED IMMUNITY**

The Sixth Circuit has held that "[g]overnment officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). "The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine

whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray*, 49 F.3d at 1158. In *Mills*, the Sixth Circuit defined that test as follows:

> Under an 'objective reasonableness' test, the officers 'will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.'

*Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986)).

In *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001), the Supreme Court set forth a two-prong test that must be applied to a qualified immunity analysis. First, a court must answer this threshold question: "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If the answer is "no," then the officer is entitled to qualified immunity. If the answer is "yes," then the court must proceed to the next step which is to determine whether the constitutional right is clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 201-202; *see O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994).

12

The defense of qualified immunity is broad enough that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

As to the issue of the procurement of the search warrant, the facts do not show that Shoffner and Hager violated any constitutional rights of the plaintiffs. In the alternative, they are entitled to qualified immunity. The application for the warrant was not so lacking in indicia of probable cause that "on an objective basis, it [was] obvious that no reasonably competent officer would have concluded that a warrant should issue." *Mills*, 389 F.3d at 577. Cline, Hurley, Gray and Clark had no involvement in the decision to procure the search warrant or in providing information to Chancellor White in order to obtain the search warrant. An officer may "rely on a judicially secured warrant for immunity from an action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). As indicated, the search warrant at issue set forth specific information collected from a confidential informant. The informant was said to have provided reliable information in the past. These are indicia of probable cause upon which an officer who did not secure the search warrant is entitled to rely. Therefore, these officers did not violate the Smiths' constitutional rights in relation to the procurement of the search warrant or, alternatively, would be entitled to qualified immunity.

**EXCESSIVE FORCE**

13

Plaintiffs argue that the force used in executing the search warrant was excessive and unreasonable under the circumstances. The complaint alleges that "masked and heavily armed deputies ... burst through [the Smiths'] door and stormed into their home." The officers "pointed guns at plaintiffs, searched plaintiffs, then forced plaintiffs to lie on the floor of their house and handcuffed them." "Plaintiff Kristie Smith was taken from her home while wearing her pajamas and was made to wait in a patrol car with her son, Plaintiff Jordan Smith." Plaintiffs note that Jordan was traumatized by the events and "rolled himself into a ball." According to his parents, he would not react to his mother's touch, later told his mother that he had been afraid his parents were being killed, and has required mental health treatment.

The Fourth Amendment protects persons from the use of excessive force by police officers in the course of an arrest, investigatory detention, or any other "seizure." In assessing a claim of excessive force, a court must therefore use the Fourth Amendment's "reasonableness" standard, "which requires careful attention to the facts and circumstances of each particular case," and which "must be judged from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). "In determining whether an officer's actions were reasonable, the specific facts of each case are key." *Neague v. Cynkar*, 258 F.2d 504, 507 (6th Cir. 2001). The court must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. There is a "built-in measure of deference to the officer's on-

14

the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

No proof has been presented that the officers had any reason to question the validity or the accuracy of the search warrant. Therefore, the only basis for finding a constitutional violation involving these defendants would be if their conduct violated the Constitution under circumstances where they believed they were executing a valid and accurate search warrant. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) ("any search or seizure that occurred while the officers were under the mistaken but reasonable belief that they were in fact executing the warrant at the correct residence would be protected by qualified immunity"). Thus, the only argument available to the Smiths against the officers is whether their conduct in executing the search warrant was so excessive that it was unconstitutional.

Plaintiffs certainly suffered some discomfort and embarrassment as a result of the events that took place in this case. However, even if all of the Smiths' factual allegations are true, no constitutional violation took place. The officers acted appropriately and did not use excessive force in entering the trailer regardless of whether the officers forced the door open or entered without forcing the door. Upon entering the trailer, the officers conducted a necessary and appropriate perimeter sweep and exercised necessary force to control the situation. Officers in their positions reasonably could have believed that the actions they took were proper, as the officers thought they were entering a residence containing known illegal drug manufacturers

15

and dealers, who presumably could have been armed. The actions the officers took were objectively reasonable under the circumstances in which they found themselves. Additionally, the actions as alleged in the complaint were appropriate and consistent with the general training received by law enforcement officers, as they are trained to secure any inhabitants in a residence to be searched and to make sure that such inhabitants are placed in a non-threatening position (such as face down on the floor). It is also appropriate to handcuff anyone who might potentially be a threat for the protection of both the officers and those in the residence. Accordingly, a temporary detention for the safety of all was not inappropriate. The plaintiffs were not injured physically and were released in a short period of time.

It is clear that Hager and Shoffner did not enter the residence until the other officers had cleared it. Thus, there is no evidence that either Shoffner or Hager used excessive force in violation of the constitutional rights of the plaintiffs. Alternatively, Shoffner and Hager are entitled to qualified immunity on this claim.

## FAILURE TO TRAIN, SUPERVISE AND CONTROL

The Smiths allege that the former Sheriff and the county failed to train, supervise and control the officers. To succeed on this claim, plaintiffs must establish that the county's official policies or customs (or lack thereof) were a "moving force [behind] the constitutional violation." Where a county's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants, the shortcoming itself can be properly thought of as a "policy or custom" that is actionable

16

under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205

(1989). In *City of Canton*, the Supreme Court indicated:

> The issue in a case like this one ... is whether [the] training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent city policy. It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390. Thus, "deliberate indifference is a stringent standard of fault, requiring proof

that a municipal actor disregarded a known or obvious consequence of his action." *Bd.*

*of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382

(1997).


To establish liability under *City of Canton*, "the plaintiff must prove ... (1) that the

training program at issue is inadequate to the tasks that officers must perform; (2) that

the inadequacy is the result of the city's deliberate indifference; and (3) that the

inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.*" Russo v. City*

*of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992) (quoting *Hill v. McIntyre*, 884 F.2d

271, 275 (6th Cir. 1989)). In addition, the focus of the court's inquiry is on the training

program itself and testimony that shows individual officers did not have specific training,

standing alone, is insufficient to defeat summary judgment. *Carey v. Helton*, 70 Fed.

Appx. 291, 2003 WL 2152511, at *3 (6th Cir. July 2, 2003). "That a particular officer

may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

17

officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. In order to state a claim against the supervisory officers, there must be some facts to show that such supervisory officers were involved in, and/or had knowledge of, the unlawful acts so as to ratify or acquiesce in them. *Gibson v. City of Clarksville*, Tenn., 860 F.Supp. 450 (M.D. Tenn. 1993).

Plaintiffs' claim fails for two reasons: (1) there is no evidence of an underlying constitutional violation; and (2) even if there were, there is no evidence of a failure to train, supervise or control. Without proof of an underlying constitutional violation, there can be no finding of liability on the part of Claiborne County. Plaintiffs have not directed the court to admissible evidence that supports a finding that the county had an official policy of unconstitutional activity or improper training, or that its conduct rose to the level of deliberate indifference. Further, the actions of the officers do not indicate any deficiency in their training, supervision or control. *See Mills*, 389 F.3d 368 (6th Cir. 2004). Even if an officer had engaged in an improper act, evidence of an isolated incident of unconstitutional activity would not establish deliberate indifference on the part of the county. *Molton v. City of Cleveland*, 839 F.2d 240, 244-45 (6th Cir. 1988).

**STATE LAW CLAIMS**

**FALSE IMPRISONMENT**

The Smiths allege that they were subjected to false imprisonment. In *Newsom v. Talhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. App. 1994), the Tennessee Court of

18

Appeals held that the elements of the tort of false imprisonment are (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint. *See Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990).

Although Mr. and Mrs. Smith were briefly detained and/or restrained, the conduct was not unlawful. The officers involved were acting pursuant to a valid search warrant and with probable cause; they were entitled to secure the residence upon entry for the safety of themselves as well as the safety of the occupants. Accordingly, the defendants are entitled to summary judgment on this claim.

## ASSAULT AND BATTERY

The Smiths allege that they were subjected to assault and battery. At common law, assault was defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against that person." *Huffman v.* State, 292 S.W.2d 738 (Tenn. 1956); *Vafaie v. Owens*, 1996 WL 502133 (Tenn. App. 1996). Based on the evidence presented (or lack thereof), a reasonable jury would conclude that the officers used the force reasonably necessary to restrain the plaintiffs. Thus, defendants are entitled to summary judgment on this claim.

## OUTRAGEOUS CONDUCT

19

The Smiths allege that they were subjected to the tort of outrageous conduct.[2] The tort exists where (1) conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. *Medlin v. Allied Inv. Co.*, 217 Tenn. 469, 398 S.W.2d 270 (1966). It is this court's responsibility to determine, in the first instance, whether the defendants' conduct was so extreme and outrageous as to permit recovery. *Alexander v. Inman*, 825 S.W.2d 102, 105 (Tenn. App. 1991).

In *Leach v. Taylor*, 124 S.W.3d 87, 92 (Tenn. 2004), the Tennessee Supreme Court held that "Tennessee has adopted the definition of outrageous conduct given in the Restatement (Second) of Torts":

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the company would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

Plaintiffs allege that they have experienced psychological injury due to the incident. However, there is no evidence from which this court could find that the

---

[2]Also known as the intentional infliction of emotional distress.

defendants engaged in conduct that would be deemed "outrageous" and extreme.  The

conduct of the defendants was objectively reasonable under the circumstances.

Therefore, this claim is **DENIED**.


## MALICIOUS HARASSMENT

The Smiths had alleged that they were subjected to malicious harassment

pursuant to Tenn. Code Ann. § 4-21-701.  This statute is part of the Tennessee Human

Rights Act and reads as follows:

> § 4-21-701.  Creation of civil action – Damages. – (a) There is hereby
> created a civil cause of action for malicious harassment.
>
> (b) A person may be liable to the victim of malicious harassment for both
> special and general damages, including, but not limited to, damages for
> emotional distress, reasonable attorney's fees and costs, and punitive
> damages.

*Id.*  In *Washington v.  Robertson County*, 29 S.W.3d 466 (Tenn.  2000), the Tennessee

Supreme Court held that:

> The claim of malicious harassment is found within the Tennessee Human
> Rights Act, which, in general, addresses discrimination based on race,
> creed, color, religion, sex, gender or national origin.
>
> *****
>
> The legislative history of Tenn. Code Ann. § 4-21-701 indicates that the
> supporters of the legislation favored creation of a civil remedy for so-called
> "hate crimes" committed by ethnic and racial supremacist groups such as
> the Ku Klux Klan, Aryan Nation and Skinheads.

*Washington*, 29 S.W.3d at 471.

Because the malicious harassment statute requires specific intent to intimidate based on civil rights motives, *Surber v. Cannon*, 2001 WL 120735 at *5 (Tenn. App. 2001), this cause of action is not available to plaintiffs. Plaintiffs have agreed to withdraw this cause of action. Accordingly, the claim is hereby **DISMISSED**.


## TRESPASS

In Tennessee, every trespass gives a right to recovery of, at least, nominal damages, and the injured party may also recover all consequential damages, as well as punitive damages in certain circumstances. *Price v. Osborne*, 147 S.W.2d 412 (Tenn. App. 1940); *Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632, 641 (Tenn. 1996). The Smiths allege that the individual defendants did not enter onto their property lawfully and are liable for trespass . However, because the officers entered the residence pursuant to a valid search warrant and with probable cause, plaintiffs' claim lacks merit. Therefore, defendants are entitled to summary judgment on this issue.


## PROPERTY DAMAGE

The Smiths allege that the individual defendants are liable for property damage to their residence. The United States Supreme Court has recognized that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258, 99 S.Ct. 1682 (1979). The test is reasonableness; destruction of property that is not reasonably necessary to effectuate the search may violate the Fourth Amendment. *United States v. Becker*, 929 F.2d 442,

22

446 (9th Cir. 1991). However, minor damage incidental to a search will not support a constitutional claim. *See, e.g., United States v. Marquez*, 337 F.3d 1203, 1209 (10th Cir. 2003).

Plaintiffs have presented no evidence as to this claim. Accordingly, plaintiffs have not established any genuine issue of material fact as to this issue on which a jury could reasonably find for them. Thus, the moving party is entitled to summary judgment.

**LIABILITY OF CLAIBORNE COUNTY**

The Smiths allege that Claiborne County is liable under Tenn. Code Ann. § 8-8-302 for the alleged wrongs committed by the individual defendants. The statute provides as follows:

> 8-8-302. Suits against counties for wrongs of deputies. – Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code Ann. § 8-8-302 pre-dates the enactment of the Tennessee Governmental Tort Liability Act (GTLA). In *Jenkins v. Loudon County*, 736 S.W.2d 603, 609 (Tenn. 1987), the Tennessee Supreme Court held that after the enactment of the GTLA, a county can still be sued for the "non-negligent" conduct (*i.e.*, conduct exceeding mere negligence) of a deputy.

23

Claiborne County has no liability under Tenn. Code Ann. § 8-8-302 because there is no evidence that the individual defendants engaged in any intentional misconduct. For the reasons discussed in this order, the conduct of all of the individual defendants was objectively reasonable and provides them immunity against this claim. The two cases cited by the plaintiffs, *Watts v. Maury County*, No. M2001-02768-COA-R3-CV (Nashville March 11, 2003) and *Doe v. Pedigo, et al.*, No. E2002-001311-COA-R3-CV (Knoxville June 30, 2003), are not dispositive under the facts of this case.

In conclusion, the defendants are entitled to summary judgment and dismissal as to plaintiffs' federal and state law claims.

**ORDER TO FOLLOW.**

**ENTER:**


_____**s/Thomas W. Phillips**_____
**UNITED STATES DISTRICT JUDGE**